FILED ENTERED
LODGED RECEIVED

DEC 13 2019

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA,** : | |
| Plaintiff, : | |
| v. : | Civil No. **CCB 19 CV 3560** |
| **Approx. $23,344.00 in U.S. Currency,** : | |
| Defendant. : | |

: : : : : : :

## VERIFIED COMPLAINT FOR FORFEITURE

Plaintiff, the UNITED STATES OF AMERICA, by its attorneys, Robert K. Hur, United States Attorney for the District of Maryland, and Joan C. Mathias, Assistant United States Attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1. This is a civil forfeiture action against seized properties that were furnished or intended to be furnished in exchange for a controlled substance or listed chemical, or constituted proceeds traceable to an exchange of controlled substances or moneys used to facilitate a violation of 21 U.S.C. § 841, and therefore should be forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

## THE DEFENDANTS *IN REM*

2. The Defendant Property consists of approximately $23,344.00 in United States currency ("the Defendant Property") seized from Rafael Enrique Peluyera at the Baltimore-Washington International Airport on March 15, 2019.

3. The Defendant Property is presently in the custody of the United States Marshals Service in the state of Maryland.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, over an action for forfeiture under 28 U.S.C. § 1355(a), and over this particular action under 21 U.S.C. § 881.

5. This court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b). Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

## BASIS FOR FORFEITURE

7. The Defendant Property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes: (1) money, negotiable instruments, securities or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; and/or (3) money, negotiable instruments, or securities used or intended to be used to facilitate a violation of the Controlled Substances Act.

2

## FACTS

8.  The forfeiture is based upon, but not limited to, the evidence outlined in the attached Declaration of Kevin Davis, Special Agent with the Drug Enforcement Administration, which is incorporated herein by reference.

**WHEREFORE**, plaintiff, the United States of America, prays that all persons who reasonably appear to be potential claimants with interests in the Defendant Property be cited to appear herein and answer the Complaint; that the Defendant Property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States dispose of the Defendant Property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Date: 12/13/19

Respectfully submitted,

Robert K. Hur
United States Attorney
District of Maryland

*Joan C Mathias*
Joan C. Mathias
Assistant United States Attorney
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
Tel: (410) 209-4800

## VERIFICATION

I, Joan C. Mathias, declare under penalty of perjury as provided by 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture is based on reports and information furnished to me by the Drug Enforcement Administration and that everything contained therein is true and correct to the best of my knowledge and belief.

Date: 12/13/19

Joan C. Mathias
Assistant United States Attorney

## DECLARATION

This affidavit is submitted in support of a complaint for forfeiture of $23,344.00 in United States Currency seized from Rafael Enrique Peluyera at Baltimore-Washington International Airport ("BWI") in the state of Maryland on March 15, 2019.

I, Kevin Davis, Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA"), submit that there are sufficient facts to support a reasonable belief that the $23,344.00 in United States Currency constitutes: (1) money, negotiable instruments, securities or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; and/or (3) money, negotiable instruments, or securities used or intended to be used to facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 841 and thus is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

1. I am assigned to the Mass Transportation Initiative Interdiction Unit based at the Baltimore-Washington International Airport ("BWI"). Members of this unit are responsible for the interdiction of drugs and drug proceeds being trafficked through BWI as well as the Port of Baltimore, highways, hotels/motels, and local bus and train stations. Members of this unit have received specialized training in narcotic interdiction and are able to identify narcotic and money couriers using a variety of methods, including receiving information from confidential sources or other law enforcement agencies and from tips provided by members of the public. Behavior characteristics and other travel indicators also aid agents in identifying and differentiating suspected drug and money couriers from the normal traveling public.

1

2. On March 15, 2019, DEA Group 56 received information that Rafael Enrique PELUYERA ("PELUYERA") was traveling from Baltimore, Maryland, aboard United Airlines flight 2059 to San Francisco with a connecting flight from San Francisco to California Redwood Coast - Humboldt County Airport ("ACV") on flight 5523. The flight was a short in duration, round trip ticket purchased by an absent third party (Purchaser Name: Finesse Lynn Murray; Address: Eureka, California) at 6:22 p.m. on March 14, 2019, approximately 24 hours before PELUYERA's scheduled departure. In addition, the return trip was scheduled with PELUYERA departing ACV airport at 6:00 p.m. on March 17, 2019, on United flight 5700 to San Francisco, then departing San Francisco at 7:10 p.m. on United flight 1136 and arriving at BWI airport at 6:49 a.m. on March 18, 2019.

3. Based on my training, knowledge, and experience, I know that the purchase of a cross-country flight approximately 24 hours prior to departure is unusual and a characteristic of a currency/contraband courier. Drug trafficking organizations ("DTO") are usually unable to provide couriers with advanced notice of when the illicit contraband will be ready for transport. Thus, couriers often purchase airline tickets within only a few days of departure - in this case less than 24 hours. The general travelling public tends to purchase airline tickets weeks or even months ahead of a trip across the country. In addition, DTOs commonly have their couriers/transporters travel on the weekends, holidays, and at extremely early or late hours of the morning and night. This is to evade detection from law enforcement because of the pre-conceived notion that federal agents and other law enforcement entities only work Monday to Friday from 9:00 a.m. to 5:00 p.m. Finally, based on my training, knowledge, and experience, I also know that California is a source state for narcotics and Baltimore, Maryland is a destination state for narcotics.

4. The flight was booked in the name "Rafaele" E. PELUYERA with a different date of birth. This is an alternate spelling of PELUYERA's first name and the date of birth was off by one day. Based on my training, knowledge, and experience, I know that this is a common tactic to avoid detection by law enforcement.

5. A criminal history check of PELUYERA revealed no drug related criminal history.

6. At approximately 5:30 p.m., DEA agents set up surveillance around the BWI gate D pier screening and gate D13 awaiting PELUYERA's arrival. At approximately 6:11 p.m., law enforcement identified PELUYERA walking quickly while looking to his left, right, and behind him as he was heading to gate D13. When PELUYERA observed law enforcement, he began to jog towards the front of the line at gate D13. Flight 2059 had already begun to board with less than an hour before departure.

7. Based on my training, knowledge, and experience, I know that drug and money couriers often check in and board their flights at the last possible minute before the flight because they believe that doing so limits their exposure to law enforcement who are in the airport terminal.

8. It appeared that PELUYERA tried to move ahead of the pre-existing line and board the plane quickly. After being unable to board the flight, PELUYERA, carrying a blue roller bag, sat in a seat across from gate D13 awaiting for his section to be called.

9. At approximately 6:15 p.m., law enforcement approached PELUYERA and I stated, "Rafael? Mr. Rafael PELUYERA?" PELUYERA looked up and responded "Yes." I then pulled out my credentials and identified myself as a Task Force Officer with the DEA. I then advised PELUYERA that he wasn't in any trouble and asked PELUYERA if he would step to the side to a more secluded area, away from the traveling public, in order to speak

3

to investigators for a couple of minutes. PELUYERA gathered himself, grabbed his belongings, and said "OK."

10. I reiterated that PELUYERA was not in any trouble and that we just wanted to ask a couple of questions to which PELUYERA nodded ok. I asked PELUYERA where he was heading to and PELUYERA paused, looked down, and responded "huh?" I again asked where he was heading to that day and PELUYERA repeated the question. I then stated again "Yes, where are you headed to?" PELUYERA replied, "Florida." I know that PELUYERA attempted to cut in line at gate 13 and he had reservations to fly to San Francisco, California.

11. I asked again, "where are you flying to?" Again, PELUYERA stated, "I'm flying to Florida." I then asked what the purpose of his trip was and PELUYERA replied "huh?" as he looked down at his feet again. I repeated the question and PELUYERA replied that he was visiting his nephew. I then asked him how long he was going to stay in Florida and again PELUYERA repeated the question and did not reply.

12. I asked PELUYERA, "who purchased your plane ticket?" and PELUYERA replied "huh?" I repeated the question and PELUYERA responded that he did not know who purchased his plane ticket. I asked PELUYERA, "where does your nephew live?" and PELUYERA stated that he did not know where his nephew lived.

13. I then advised PELUYERA that BWI airport in Baltimore has a lot of illicit narcotics that are brought in through source cities and that there are large amounts of drug proceeds departing the airport to these source areas. PELUYERA immediately stated, "I don't have any drugs in my luggage, just my money." I asked how much money he was carrying and

4

PELUYERA stated "Twenty five." I asked "Twenty-five thousand?" and PELUYERA replied "yes."

14. At that time, I asked PELUYERA if investigators could search his luggage and PELUYERA said yes. Before searching the blue Concourse luggage belonging to PELUYERA, canine narcotics Officer Brian Jordan and his narcotics detection canine partner "Malik" conducted a canine scan of the luggage. Officer Jordan advised that Malik had indicated a positive alert to the presence of the odor of narcotics from the piece of luggage.

15. Law enforcement opened and conducted a search of the PELUYERA's luggage. Law enforcement immediately detected a strong odor of marijuana emanating from inside PELUYERA's luggage. I asked about the odor coming from his bag and PELUYERA replied that he smokes marijuana regularly.

16. A search of the bag revealed multiple bundles of United States Currency that smelled like marijuana, wrapped in rubber bands distributed in numerous pockets of PELUYERA's belongings. Bundles were concealed in jeans pockets, black sweat pants pockets, burgundy sweat pants, and inside a white shirt. Based on my training, knowledge, and experience, I know that this is a common way for money couriers to carry their drug proceeds through the airport. The cash is concealed this way, spread through numerous clothes pockets, to avoid detection by TSA screening areas by minimizing the footprint it leaves in x-ray machines.

17. Some of the bundles appeared to be one thousand dollar increments or "stacks." Based on my training, knowledge, and experience, I know that DTOs commonly package their drug proceeds in thousand dollar increments when replenishing their drug supply from their

source. This packaging facilitates quick counting of the money, which helps ensure that narcotics transactions are short to avoid detection by law enforcement.

18. Additionally, the bundles of cash appeared to consist primarily of smaller denomination bills, *i.e.*, twenty-dollar bills or less. Based on my training, knowledge, and experience, I know that drug and money couriers commonly carry denominations of twenty-dollar bills or less, consistent with street-level drug trafficking, because such denominations are more easily passed into circulation.

19. I asked PELUYERA if he had any documentation or if he could provide any banking information via his cell phone to provide investigators with insight as to how he came into possession of the cash. PELUYERA replied "no." I asked PELUYERA what the purpose of having the money was. PELUYERA looked down and said "huh?" I repeated the question. Then, PELUYERA repeated the question, paused, and said "I like to gamble." I again asked PELUYERA where he was heading to and PELUYERA replied "Florida."

20. I then asked PELUYERA which gate he was flying out of and PELUYERA pointed to gate D13. I advised PELUYERA that that particular gate was destined for San Francisco, California and PELUYERA said "oh." Then, he paused and said, "Well, I'm going to Florida after California." I asked if he purchased a flight to Florida yet and PELUYERA replied "no." I asked PELUYERA when he was returning from his trip and PELUYERA said that he did not know.

21. I asked PELUYERA what his occupation was and how much money he earned last year. PELUYERA replied that he did construction, tattoos, and gambled. PELUYERA said he did not know how much money he made. I then asked what his nephew's name was and PELUYERA repeated the question, paused, and then said he did not know.

6

22. I advised PELUYERA that, based on the totality of the circumstances, the United States Currency was going to be seized as suspected drug proceeds for possible forfeiture. PELUYERA said, "this is embarrassing." I asked PELUYERA for his current address for notification and PELUYERA said the one on his driver's license, in York, Pennsylvania. I asked PELUYERA for his cell phone number and PELUYERA said "huh?" as he looked down. PELUYERA repeated the question then stated a telephone number. Law enforcement provided PELUYERA with a receipt (Form DEA-12) for the seized United States Currency. In addition, I placed the cash in an evidence bag and the evidence bag was signed by law enforcement and PELUYERA. The bag was sealed in front of PELUYERA before he departed for his flight. At that time, PELUYERA continued onto his flight to San Francisco.

23. After the plane departed, Officer Jordan and his narcotics detection canine Malik conducted a second canine scan, this time of the seized currency hidden by law enforcement in a controlled environment in advance and out of the presence of Officer Jordan and Malik. Officer Jordan and canine Malik entered the controlled environment room and Malik began to work the area independently. Canine Malik indicated a positive alert to the bottom drawer of a cabinet that was the location where the seized currency had been hidden by law enforcement. Therefore, this scan resulted in a positive alert for the presence of the odor of narcotics on the seized currency.

24. Narcotic detector dog Malik is trained and certified to alert to the presence of the odor of controlled substances. These substances include cocaine, heroin, marijuana, and ecstasy. Upon location of one of these controlled substances, Malik is trained to sit at the source of the odor. This is called an "alert." This alert may also indicate items recently contaminated

with the odor of one or more of the controlled dangerous substances. Canine Malik is assigned to Officer Brian Jordan of the Maryland Transportation Authority Police. Canine Malik and Officer Jordan receive monthly training in order to maintain Malik's reliability in the detection of controlled dangerous substances.

25. On March 21, 2019, law enforcement transported the seized United States Currency to Loomis Bank for an official count. The official count was $23,344.00.

26. A check of PELUYERA's wage history through Pennsylvania revealed no wages found for 2017, 2018, or 2019. For 2016, PELUYERA earned a total of $5,802.41 through Chartwell Staffing Services, Inc., Abacus Corporation, and Ruggieri Enterprises LLC. For 2015, PELUYERA earned a total of $2,500.52 through Chartwell Staffing Services, Inc.

27. A check of PELUYERA's flight history revealed numerous last minute bookings for short duration, cross-country round trip flights from BWI to ACV airport in California. Several of the flights were purchased within hours of departure and paid for in cash at the ticket counter. For example, on April 24, 2018, PELUYERA booked and traveled on the following flight: booked at 3:39 p.m., United flight 2059, departing at 6:29 p.m. BWI to SFO, connecting flight United flight 5523 SFO to ACV arriving April 24, 2018 at 11:55 p.m. On April 25, 2018, at approximately 5:48 p.m., PELUYERA departed ACV airport on United flight 5700 to SFO. That same night, at approximately 9:54 p.m., PELUYERA departed SFO arriving at BWI on April 26, 2018 at 5:52 a.m.

28. In addition to the fact that PELUYERA spent less than 19 hours in Humboldt County, California, he also booked the flight within hours of departure and paid for the flight in cash at the ticket counter. All of these aspects are consistent with money and drug couriers. PELUYERA repeats this same pattern several times as listed in the chart below:

8

United Airlines Flight History

| Date | Departing Airport | Arrival Airport | Booking To Departure time | Payment Type | Time At Destination |
|---|---|---|---|---|---|
| 7/16/2017 | IAD | SFO | 13 hours | Cash | 72 hours |
| 7/16/2017 | SFO | ACV | | | |
| 7/19/2017 | ACV | SFO | | | |
| 7/19/2017 | SFO | PHX | | | |
| 12/22/2017 | BWI | ORD | 9 hours | Credit | 12 hours |
| 12/22/2017 | ORD | SFO | | | |
| 12/22/2017 | SFO | BWI | | | |
| 1/14/2018 | BWI | DEN | 10 hours | Credit | 11 hours |
| 1/14/2018 | DEN | MFR | | | |
| 1/15/2018 | MFR | SFO | | | |
| 1/15/2018 | SFO | BWI | | | |
| 2/2/2018 | BWI | SFO | 2 hours | Cash | 7 hours |
| 2/2/2018 | SFO | ACV | | | |
| 2/3/2018 | ACV | SFO | | | |
| 2/3/2018 | SFO | BWI | | | |
| 2/19/2018 | BWI | SFO | 21 hours | Credit | 7 hours |
| 2/19/2018 | SFO | ACV | | | |
| 2/20/2018 | ACV | SFO | | | |
| 2/20/2018 | SFO | BWI | | | |
| 4/24/2018 | BWI | SFO | 3 hours | Cash | 18 hours |
| 4/24/2018 | SFO | ACV | | | |
| 4/25/2018 | ACV | SFO | | | |
| 4/25/2018 | SFO | BWI | | | |
| 5/16/2018 | BWI | SFO | 3 hours | Cash | 18 hours |
| 5/16/2018 | SFO | ACV | | | |
| 5/17/2018 | ACV | SFO | | | |
| 5/17/2018 | SFO | BWI | | | |
| 8/7/2018 | BWI | SFO | 25 hours | Cash | Unknown |
| 8/8/2018 | SFO | ACV | | | |
| 3/15/2019 | BWI | SFO | 22 hours | 3rd party | 42 hours |
| 3/15/2019 | SFO | ACV | | | |
| 3/17/2019 | ACV | SFO | | | |
| 3/17/2019 | SFO | BWI | | | |

29. Eureka, California is in Humboldt County. Based on my training, knowledge, and experience, I know that Humboldt County is part of the "Emerald Triangle," which is the largest cannabis-producing region in the United States. State regulators estimate that the region produces 1.7 million pounds of marijuana per year.

9

30. Based on my training, knowledge, and experience, I believe that the $23,344.00 in United States Currency seized from Rafael Enrique PELUYERA at BWI on March 15, 2019, is drug proceeds or money intended to purchase drugs because of the following factors:

   i. The $23,344.00 included small denominations of currency consistent with street level narcotics trafficking;

   ii. The manner of bundling and packaging of the $23,344.00 was consistent with street level narcotics trafficking;

   iii. Travel to a major source State for narcotics (California);

   iv. Travel from major destination area (Baltimore, Maryland);

   v. PELUYERA had an overwhelming odor of marijuana emanating from his luggage and currency;

   vi. PELUYERA made numerous contradicting, inconsistent statements and exhibited deceptive behavior;

   vii. Quick turn-around ticket purchased within 24 hours of departure by an absent third-party;

   viii. Limited wage history to support possession of $23,344.00;

   ix. A drug detection canine alerted indicating the presence of the odor of narcotics on the $23,344.00; and

   x. PELUYERA could provide no documentation of a legitimate source for the $23,344.00.

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO TITLE 28 U.S.C. § 1746 THAT THE FACTS SUBMITTED BY THE DRUG ENFORCEMENT ADMINISTRATION IN REFERENCE TO THE SEIZURE OF $23,344.00 IN UNITED STATES CURRENCY FROM

RAFAEL ENRIQUE PELUYERA ARE ACCURATE, TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

                                                  Kevin Davis
                                                  Task Force Officer
                                            Drug Enforcement Administration